# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## SHREVEPORT DIVISION

| | |
|---|---|
| **KENYON J. GARRETT** | **CIVIL ACTION NO. 5:17-0784** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **UNITED STATES OF AMERICA** | **MAG. JUDGE KAREN L. HAYES** |

## RULING

Pending before the Court are cross-motions for summary judgment filed by Plaintiff Kenyon J. Garrett ("Garrett") [Doc. No 77] and Defendant United States of America ("United States") [Doc. No. 81]. Additionally, pending is the United States' Motion to Strike Summary Judgment Evidence ("Motion to Strike") [Doc. No. 86]. The United States moves the Court to strike Exhibits 17-B, 57, 58, 78-B, 80, 80-A, 80-B, and 80-C that Garrett attached in support of his Motion for Summary Judgment.

For the following reasons, the United States' Motion to Strike is GRANTED IN PART and DENIED IN PART, Garrett's Motion for Summary Judgment is DENIED, and the United States' Motion for Summary Judgment is GRANTED.

## I. FACTS AND PROCEDURAL HISTORY

Garrett brought this action, *pro se*, after the death of his father, Clarence Garrett. He contends that his father received substandard medical care, which culminated in his premature death on August 28, 2015.

Clarence Garrett was hospitalized at Overton Brooks VA Medical Center ("OBVAMC")

from April 11, 2015, to July 1, 2015.   He was 68 years old at the time and suffered from

numerous medical conditions, including metastatic prostate cancer, uncontrolled diabetes,

dyslipidemia, hypertension, and post-traumatic stress disorder ("PTSD").    At the time he

presented to the OBVAMC, he was in septic shock with multi-organ failure and diabetic

ketoacidosis.

     During Clarence Garrett's treatment at OBVAMC, his condition improved somewhat, but

he remained ill with extensive problems.   He was treated by fifteen (15) different medical

specialist teams at OBVAMC, including internal medicine, infectious disease, neurosurgery,

neurology, hematology/oncology, urology, pulmonary, interventional radiology, orthopedics,

gastroenterology, general surgery, nutrition, physical/occupational therapy, psychiatry, and

palliative care.

     During his father's stay at OBVAMC, Garrett surreptitiously recorded conversations with

Dr. Mustafa Mehmood; Zelda Graggs ("Graggs"), a registered nurse; and Janet Michaels

("Michaels"), a social worker.   Dr. Mehmood stated in the recording that it was his "first time"

to see Clarence Garrett.   As he and Garrett discussed Clarence Garrett's care, Dr. Mehmood

explained that doctors sometimes or even "most of the times" make notes on patients before they

round on those patients.   However, he also explained that patients are rounded on every day, and

treatment decisions may change based on the rounding and may be discussed over the telephone,

even if notes are not always updated.

     During the conversations with Graggs and Michaels, they expressed concerns about

patient care at OBVAMC.

     Michaels also identified as an issue that, on some days, Clarence Garrett was able to

make decisions for himself, but on other days, he wanted Garrett to make decisions for him. [Doc. No. 93-3, p. 13]. Dr. Mehmood, likewise, indicated that Clarence Garrett had been making decisions for himself, but would change his mind about what care he wished to receive. [Doc. No. 93-3, p. 16].

None of the recorded persons stated that the OBVAMC had breached the standard of care for Clarence Garrett. Neither Graggs nor Michaels is qualified to opine on the physician standard of care. Dr. Mehmood, who is so qualified, offered opinions on how rounds should be handled properly, but did not state that Clarence Garrett had not received treatment within the standard of care.

In June 2015, Garrett requested that his father be moved to a long-term acute care facility, or an "LTAC." Dr. John Areno was the Acting Chief of Staff for OBVAMC at that time. In that position, Dr. Areno made the determination whether Clarence Garrett could be transferred as requested. Dr. Areno did not physically assess Clarence Garrett himself, but did personally speak to his attending physician, his treating physical therapist, and the Chief of Medical Services. After these conversations and a review of Clarence Garrett's medical records, Dr. Areno would not approve the transfer at that time. In part, Dr. Areno relied on his understanding that Clarence Garrett was not actively participating in his physical therapy.

In a deposition, however, Dorothy Phelps ("Phelps"), a certified physical therapy assistant, testified about her work with Clarence Garrett. She testified that he was actively participating his therapy.

However, on July 1, 2015, Clarence Garrett was transferred to Watkins Logan War Veterans Home ("Watkins Logan") in Tyler, Texas. Garrett contends that OBVAMC did not

obtained informed consent for Clarence Garrett's transfer to Watkins Logan and that this transfer was the proximate cause of his father's loss of chance of survival and ultimate death because his father was not medically stable enough to be transferred.

Garrett relies on the telephone records prior to his father's transfer to Watkins Logan to support his claim that he did not consent to the transfer. OBVAMC employee, Jennifer Blair ("Blair"), has been deposed and testified that she had no memory of the phone call to Garrett, but gave testimony as to how consent normally occurs. She indicated that the doctor would have placed the call and asked for the consent, and she would have verified the consent as well as the address and phone number.

Clarence Garrett was taken from Watkins Logan to Christus Trinity Mother Frances Hospital in Tyler, Texas, on July 2, 2015.

Clarence Garrett died on August 28, 2015, almost two months after he left OBVAMC.

On July 18, 2016, Garrett filed an administrative claim with the Department of Veteran Affairs ("VA"), alleging that medical malpractice by OBVAMC health care providers caused his father's death. Garrett retained an expert psychiatrist, Dr. Theresa Vail, who opines that the OBVAMC breached the standard of care in allowing Clarence Garrett to make his own medical decisions. Dr. Vail does not opine that if Garrett had been allowed to make decisions about his father's medical care the clinical outcome would have been different, nor does she opine that the alleged deviation from the standard of care caused Clarence Garrett's death.

The United States' expert witness, Dr. Eric Stupka, has reviewed the voluminous records in this matter and opined that the entire course of Clarence Garrett's treatment at OBVAMC met, and often exceeded, the standard of care.

The United States also has a rebuttal witness, Dr. Christopher Ticknor, who responded to Dr. Vail's report and concluded that Clarence Garrett was capable of making his own medical decisions.   Even if he were not, however, Dr. Ticknor, consistent with Dr. Stupka, opines that this alleged failure did not cause Clarence Garrett's death.

On June 6, 2016, Garrett brought suit against the United States, through the Department of Veteran Affairs and Overton Brooks V.A. Medical Center ("OBVAMC"), and individual Defendants Kenneth Booth, Larry G. Thirstrup, Robert Lukeman, Agmasie B. Woldie, Arvind Yekanath, Furqan Mahammad, and other known and unknown medical staff, alleging that they were responsible and liable for the death of his father.   Garrett alleged that Defendants were responsible for abuse, negligence, false imprisonment, intimidation, and medical malpractice, which resulted in Clarence Garrett's psychological injury, emotional distress, and wrongful death.   Garrett requested compensatory damages totaling $4 million.

On July 20, 2017, Garrett amended/supplemented his Complaint to correct the spelling of the name of one Defendant (Yekanath) and to add eight paragraphs, specifying claims for delayed diagnosis, failure to diagnose, false imprisonment, intimidation, inappropriate discharge, emotional distress, and failure to treat medical diagnosis, resulting in physical and mental anguish, pain and suffering, medication toxicity, and loss of mobility, which combined to cause Clarence Garrett's wrongful death.   [Doc. No. 3].

On August 31, 2017, Garrett voluntarily dismissed his claims against Defendant Toby Mathew.   [Doc. No. 5].

On September 1, 2017, the United States filed a Motion to Dismiss for Lack of Jurisdiction [Doc. No. 7], as well as an Answer [Doc. No. 8] to the Complaint.

On September 15, 2017, Garrett and the United States jointly stipulated to dismissal of all Defendants except the United States.

On September 22, 2017, the United States filed a reply [Doc. No. 24] in support of its Motion to Dismiss, conceding that its motion was moot as to the dismissed Defendants, but that the motion was still actionable as to Garrett's claims for intimidation, abuse, emotional distress, false imprisonment, and psychological injury.

On September 28, 2017, Garrett filed a Motion to Dismiss for Perjury [Doc. No. 26], contending that the Court should rule in his favor because of the United States' perjury and award him the requested amount of $4,000,000.

On December 20, 2017, with leave of Court, Garrett filed an Amended Complaint [Doc. No. 49].

The same day, December 20, 2017, after briefing for both motions was complete, Magistrate Judge Hayes issued a Report and Recommendation [Doc. No. 50], recommending that the Court grant in part and deny in part as to the United States' Motion to Dismiss and deny Garrett's Motion to Dismiss for Perjury.   First, she recommended that the United States' Motion to Dismiss be granted as to Garrett's claim for false imprisonment, but construed his allegations to assert a claim for negligent restraint, which falls within the auspices of his medical malpractice claim.   She recommended that the motion be denied to the extent that the United States argued that Garrett had failed to exhaust his administrative remedies on his other claims.   With regard to Garrett's motion, Magistrate Judge Hayes explained that the Court cannot "dismiss" any claims of the government.   Instead, plaintiff likely intended for the Court to strike the United States' answer and enter a judgment of default.   However, there was no statement under oath at

issue, nor was there any evidence that the United States knew its statements were false. Additionally, Magistrate Judge Hayes could find no bad faith behind the United States' arguments, particularly in light of "the imprecise and ambiguous nature of [Garrett's] claims and allegations." Therefore, she recommended denial of Garrett's motion.

On January 9, 2018, the Court adopted the Report and Recommendation of Magistrate Judge Hayes, granted in part and denied in part the United States' Motion to Dismiss and denied Garrett's Motion to Dismiss for Perjury, as recommended. [Doc. No. 54].

On May 18, 2018, Garrett filed a motion to amend his Complaint [Doc. No. 60]. Garrett sought to add claims for negligent credentialing/privileges and negligent hiring and to correct certain paragraphs of the original Complaint. After briefing by the parties, Magistrate Judge Hayes issued a Memorandum Order [Doc. No. 69] denying the motion to amend. Magistrate Judge Hayes found that the Court lacks subject matter jurisdiction over the proposed additional claims because Garrett had failed to exhaust his administrative remedies with regard to these claims, and, therefore, amendment would be futile. The remainder of the proposed amended complaint only sought to clarify allegations in the original Complaint, and Garrett had not demonstrated that amendment was necessary.

On October 9, 2018, Garrett filed a letter motion requesting an extension of the expert report deadline to October 9, 2018. [Doc. No. 75]. Magistrate Judge Hayes granted Garrett's motion and extended the deadline a like number of days for the United States. [Doc. No. 76].

On November 13, 2018, Garrett filed the instant Motion for Summary Judgment [Doc. No. 77].

On November 16, 2018, Garrett filed a Motion for Sanctions [Doc. No. 79].

On November 21, 2018, the United States filed its cross Motion for Summary Judgment [Doc. No. 81].

On December 3, 2018, Garrett filed an Amended Motion for Sanctions and Motion in Limine [Doc. No. 83].

On December 4, 2018, the United States filed the instant Motion to Strike [Doc. No. 86] and a Memorandum in Opposition to Garrett's Motion for Summary Judgment [Doc. No. 87].

On December 13, 2018, the United States filed a Motion to Strike Jury Demand [Doc. No. 89], explaining that Garrett is not entitled to a jury trial under the FTCA.

On December 17, 2018, Garrett filed a Reply in Support of his Motion for Summary Judgment [Doc. No. 91], a Response to the Motion to Strike [Doc. No. 92], and a Memorandum in Opposition to the United States' Motion for Summary Judgment [Doc. No. 93].

On December 18, 2018, the United States responded to Garrett's Motion for Sanctions and Amended Motion for Sanctions and Motion in Limine [Doc. No. 94].

On December 27, 2018, Garrett filed a Reply memorandum in support of his Motion for Sanctions and Motion in Limine [Doc. No. 97].

On December 31, 2018, the United States filed a Motion to Stay the proceedings in this case because of the lapse in funding. [Doc. No. 98]. That motion was granted on January 2, 2019, and all deadlines were extended commensurate with the duration of the lapse in appropriations. [Doc. No. 99].

On January 29, 2019, the United States filed a Motion for a Status Conference and a Notice of Restoring Appropriations. [Doc. No. 100]. On January 31, 2019, the stay was lifted, trial was continued, and the deadlines for the United States to file replies in support of their

Motions for Summary Judgment and to Strike were re-set to February 15, 2019. [Doc. No. 102]. Court referred the case for a status conference with Magistrate Judge Hayes.

On February 6, 2019, the United States filed its replies in support of its Motion to Strike [Doc. No. 105] and its Motion for Summary Judgment [Doc. No. 106].

On February 7, 2019, a status conference was conducted by Magistrate Judge Hayes. After confirming with Garrett that the Motion to Strike Jury Demand was unopposed, Magistrate Judge Hayes granted the motion and re-set this matter for trial on April 29, 2019. Expert depositions were ordered to be held by March 15, 2019.

On February 12, 2019, the Court issued a Ruling and Order [Doc. Nos. 109 & 110] denying Garrett's Motion for Sanctions and Amended Motion for Sanctions and Motion in Limine.

That same day, Garrett filed a motion for leave to file a sur-reply in response to the United States' Motion to Strike. The Court granted that motion, and Garrett's additional telephone records have been filed as part of the record in this case. [Doc. No. 113].

On February 14, 2019, Garrett filed a Motion to Clarify [Doc. No. 114] the Court's February 12, 2019 Ruling and Order. In that motion, he explained that he never "knowingly submitted to the Court any Motions to Dismiss Clarence Garrett entire medical record." *Id.* at p. 2. Instead, it was his intent that the Court consider the exhibits he has presented to show that the record is "falsified, inaccurate, and unreliable." *Id*. at 3.

On February 15, 2019, the Court issued a Memorandum Order [Doc. No. 115] on Garrett's Motion to Clarify. The Court noted that, "[g]iven Garrett's arguments, both the United States and the Court reasonably believed that he was asking that the record be stricken or not

considered." *Id.* However, to the extent that Garrett wanted the record to be clarified as to his intent, the Court granted his motion and "clarified that Garrett is not seeking exclusion of his father's entire medical record." *Id.* The Court found no revision to the February 12, 2019 Ruling and Order was necessary.

The Court is now prepared to ruling on Garrett's pending Motion for Summary Judgment [Doc. No. 77] and the United States' pending Motion to Strike [Doc. No. 86] and Motion for Summary Judgment [Doc. No. 81].

## II.    LAW AND ANALYSIS

### A.    Motion to Strike

The United States moves the Court to strike Garrett's Exhibits 17-B, 57, 58, 78-B, 80, 80-A, 80-B,and 80-C.   Garrett opposes their motion.

Under Federal Rule of Civil Procedure 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."

> Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented *or to explain the admissible form that is anticipated*.

FED. R. CIV. P. 56, advisory committee note 2010 amend (emphasis added).   Thus, pursuant to this standard, the Court must determine whether the contested exhibits are admissible in their current form or whether Garrett has provided a sufficient explanation of how they will be admissible at the time of trial.

### 1.      Transcripts of Recorded Conversations

First, the United States objects to the Court's consideration of Exhibits 17-B, 57, 58, and 78-B, which are transcripts of oral recordings Garrett made of conversations between him and three OBVAMC employees.   The United States originally moved to strike these documents because the purported transcripts did not appear complete, they were not certified, and Garrett had interjected his commentary in the transcripts.   After the United States objected, however, Garrett obtained certified transcripts of the recordings as Exhibits, and all commentary has been removed.

In its reply, the United States appears to have abandoned its original objections, but now objects that transcripts should be stricken because they are unsworn statements, and, in any event, would only be admissible if they could be shown to contradict the witnesses' testimony. The United States argues further that the statements are irrelevant and the prejudicial value of the statements outweigh their probative effect.

The Court disagrees.   As an initial matter, the Court notes that Louisiana is a one-party consent state, and Garrett had the right to record conversations to which he was a party without informing the other person.   *See* LA. REV. STAT. § 15:1303(C)(4) ("It shall not be unlawful . . . for a person not acting under color of law to intercept a [n] ... oral communication where such person is a party to the communication"); *see also* 18 U.S.C. § 2511(2)(d) (providing for a "one-party consent" rule under federal law, unless a state imposes a stricter standard).

Further, at this stage of the litigation and considering the standard for review for motions for summary judgment, the Court finds that the recordings and transcripts of the recordings are relevant to Garrett's claims that the United States is liable for failing to provide medical

treatment within the applicable standard of care. *See* FED. R. EVID. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); *see also* Fed. R. Evid. 402 ("All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. . ."). Each of the persons recorded, and whose conversations with him were subsequently transcribed, had some role in his father's health care treatment and/or management of that treatment. While their statements may indeed be prejudicial, the Court cannot say, again, at this stage of the litigation that the probative value of the statements "is substantially outweighed by the danger of . . . unfair prejudice." FED. R. EVID. 403.

Finally, the Court finds that the transcribed statements are admissible evidence. Transcriptions of lawfully recorded conversations must meet the other admissibility standards under the Federal Rules of Evidence. Although his original transcripts were not certified and contained commentary, Garrett has now resolved that issue by having the recording fully transcribed. Thus, the United States has apparently abandoned its authentication argument. Instead, the United States argues that the statements do not meet the requirement of the prior, recorded statement exception to the hearsay rule, FED. R. EVID. 801(d)(1), because the statements were not made under oath and they do not contradict any testimony of the declarants.

However, the United States did not consider Rule 801(d)(2). A "'statement'" includes "a person's oral assertion." FED. R. EVID. 801(a). A statement is not hearsay if "[t]he statement is offered against an opposing party and . . . was made by the party's agent or employee on a matter

within the scope of the relationship and while it existed." Fed. R. Evid. 801(d)(2). In this case, each of the persons recorded acted on behalf of OBVAMC in providing treatment to Clarence Garrett. Accordingly, their statements can be offered against the United States.

To the extent that the United States moved to strike the original transcripts which contained commentary and were not complete, the Motion to Strike is GRANTED, and the Exhibits 17-B, 57, 58, and 78-B attached to Garrett's Motion for Summary Judgment [Doc. No. 77-5, pp. 3-12] are STRICKEN from the record. To the extent, however, that the United States has moved to strike the "Full" transcripts also filed as Exhibits 17-B, 57, 58, and 78-B [Doc. No. 93-3, pp. 4-21], the Motion to Strike is DENIED.

### 2. Telephone Records

The United States also moves to strike the telephone bills filed as Exhibits 80, 80-A, 80-B, and 80-C. The United States argues that the telephone bills are not authenticated, incomplete, and uncertified. The United States points out that the bills are heavily redacted and hard to comprehend and that they are, in any event, irrelevant.

In a sur-reply, Garrett attached what he asserts are his "entire phone records" for the telephone numbers in question.

Under Federal Rule of Evidence 901, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." "For a telephone conversation, evidence that a call was made to the number assigned at the time to . . . a particular person, if circumstances, including self-identification, show that the person answering was the one called." *Id.* at 901(b)(6).

"A properly authenticated telephone bill can be admissible under the business records exception to the hearsay exclusion rule." *United States v. Beasley*, 447 F. App'x 584, 586 (5th Cir. 2011) (citing *United States v. Vela*, 673 F.2d 86, 89 (5th Cir.1982) (citing Fed. R. Evid. 803(6)). In one recent unpublished decision on the appeal in a criminal case, the Fifth Circuit found that, if the telephone record is admissible under this exception, the party's own testimony that the bill is his and reflects his telephone activity is "sufficient to authenticate [an] unredacted bill copy." *Id.* (citing *United States v. Wake,* 948 F.2d 1422, 1434 (5th Cir. 1991); Fed. R. Evid. 901(a)). In that particular case, the record was also admissible as non-hearsay as a statement by a party opponent, however. *Id.*

In other cases telephone records have been admitted into evidence under the business records exception to the hearsay rule after the testimony of an employee of the provider, even if the records are computer-generated. *See, e.g., United States v. Vela*, 673 F.2d 86, 90 (5th Cir. 1982) (telephone records were properly admitted where "[a] telephone company employee explained the precise manner in which the billing data are compiled.)

In this case, it appears that Garrett could present his telephone records in a form that would be admissible in evidence at trial, even if they are not currently in that form. Accordingly, the Court will consider his arguments based on the telephone records as well. The United States' Motion to Strike is also DENIED in this regard.

### B.    Motions for Summary Judgment

#### 1.    Standard of Review

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which

summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp*., 19 F.3d 1017, 1023 (5th Cir. 1994). In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr*., 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson*, 477 U.S. at 248).

In a bench trial, "a district court has somewhat greater discretion to consider what weight it will accord the evidence." *In re Placid Oil Co.,* 932 F.2d 394, 397 (5th Cir. 1991). A court "has the limited discretion to decide that the same evidence, presented to him or her as a trier of

fact in a plenary trial, could not possibly lead to a different result." *Id.* at 398 (citing *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124 (5th Cir. 1978)).

## 2. Federal Tort Claims Act

Garrett brings his claims against the United States under the FTCA, 28 U.S.C. § 2671, *et seq.* The FTCA is a limited waiver of immunity that allows a plaintiff to recover damages for injury caused by negligent employees of the United States while acting within the scope of their office or employment. *United States v. Orleans*, 425 U.S. 807, 813 (1996). The FTCA subjects the United States to tort liability if a private person would be liable for the same act under state law. *Life Partners, Inc. v. United States*, 650 F.3d 1026, 1030–31 (5th Cir. 2011) (citations omitted).

The appropriate law to follow in determining liability under the FTCA is the law of Louisiana, where the negligent act is alleged to have occurred. *See Richards v. United States*, 369 U.S. 1 (1962); *see also* 28 U.S.C. § 1346(b) ( "in accordance with the law of the place where the act or omission occurred"). Garrett, although styling his claims under a number of different names or causes of action,[1] has argued that the United States is liable for two separate, but related types of medical negligence: failure to obtain informed consent and medical malpractice in the treatment of Clarence Garrett.

First, Garrett alleges that the United States is liable for failing to obtain informed consent within the applicable standard of care. *See Lugenbuhl v. Dowling*, 701 So.2d 447, 453 (La. 1997) (Liability in lack of informed consent cases "(which include no-consent cases)" is "based on breach of the doctor's duty to provide the patient with material information concerning the

medical procedure."). "'[T]he only theory on which recovery may be obtained is that of negligence' in a lack of informed consent case." *Thibodeaux v. Jurgelsky*, 898 So.2d 299, 314 (La. 2005). Therefore, the plaintiff in an informed consent action must establish the following elements:

(1)     the existence of a material risk which the physician must disclose;

(2)     the failure of the physician to inform the patient of a material risk;

(3)     the realization of the material risk; and

(4)     a causal connection between the failure to inform the patient of the risk and realization of the risk.

*Hamilton v. Negi,* No. CIV.A. 09-0860, 2014 WL 1388260, at *4 (W.D. La. Mar. 31, 2014), *aff'd*, 595 F. App'x 346 (5th Cir. 2014) (citing *Maybrier v. La. Med. Mut. Ins. Co*., 12 So.3d 1115, 1119 (La. App. 3d Cir.2009) (citations omitted).

Second, Garrett alleges negligence arising out of medical care or treatment by OBVAMC Employees. Under the FTCA, the Court must also look to state law on medical malpractice. *Anderson v. United States*, 388 Fed. App'x 406, 407 (5th Cir. 2010) (citing *Ayers v. United States*, 750 F.2d 449, 452 n.1 (5th Cir. 1985)).

In Louisiana medical malpractice actions, a plaintiff must prove the following:

(1)     The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians . . . licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances . . . ;

(2)     That the defendant either lacked this degree of knowledge or skill or failed

---

[1]Garrett asserts claims for abuse, negligence, false imprisonment, intimidation, and medical malpractice. [Doc. No. 77-2, p. 2].

to use reasonable care and diligence, along with his best judgment in the application of that skill.

(3)    That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

LA. REV. STAT. § 9:2794(A).   In other words, "a plaintiff must prove not only that the applicable standard of care was breached, but also that the doctor's substandard conduct caused an injury . . . that the plaintiff would not otherwise have suffered."   *Byrd v. State Through Dep't of Pub. Safety & Corr.*, No. 93-2765 (La. 5/23/94); 637 So.2d 114, 122.   If a physician is deemed negligent, his employer is vicariously liable for his breach of this professional duty.   LA. CIV. CODE ART. 2320.

"Expert testimony is generally required to establish the applicable standard of care and whether or not that standard was breached, except where the negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony."[2]   *Gleason v. La. Dep't of Health & Hosp.*, No. 44,947, p. 7 (La. App. 2 Cir. 3/10/10); 33 So.3d 961, 966 (citing *Samaha v. Rau*, 07-1726 (La. 2/26/08); 977 So.2d 880).   "Although causation is not explicitly included among those elements for which proof must be made through expert medical testimony, typically expert testimony is required to prove causation when the resolution of that issue is not a matter of common knowledge."   *Id*. at 966.

The Court finds that Garrett has failed to carry his evidentiary burden in this case.   On

---

[2]"The Louisiana Supreme Court has stated that '[e]xpert testimony is not required where the physician does an obviously careless act, such as fracturing a leg during examination, amputating the wrong arm, dropping a knife, scalpel, or acid on a patient, or leaving a sponge in a patient's body, from which a lay person can infer negligence.'" *Cruse v. United States*, No. CIV.A. 13-785, 2015 WL 6134030, at *2 (E.D. La. Oct. 19, 2015) (quoting *Pfiffner v. Correa*, 643 So. 2d 1228, 1233 (La. 1994)).

the other hand, the United States has presented unrebutted, affirmative expert evidence that the medical treatment Clarence Garrett received either met or exceeded the standard of care and, thus, did not reduce his chance of survival or result in his ultimate demise. Therefore, summary judgment in favor of the United States is appropriate.

### a. Informed Consent Claims

First, Garrett raises three main claims that the United States is liable for failure to obtain informed consent: (1) OBVAMC employees obtained his consent to the placement of a central line by falsely representing that Clarence Garrett did not have vein access and by failing to disclose the material risks; (2) OBVAMC employees failed to obtain consent at all for the replacement of the central line after his father became confused and pulled it out; and (3) OBVAMC employees failed to obtain consent at all for the transfer of Clarence Garrett from OBVAMC to Watkins Logan.

### (1) Central Line Placement

With regard to the original placement of a central line, it is undisputed that on April 11, 2015, Garrett signed an informed consent form to allow this procedure to take place.[3] [Doc. No. 87-2, Govt. Exh. 1]. Garrett contends this was the "wrong" form because it is a general form called a "REQUEST FOR ADMINISTRATION OF ANESTHESIA AND FOR PERFORMANCE OF OPERATIONS AND OTHER PROCEDURES." *Id.* However, in block 2, the form itself states that the procedure for which consent is being obtained is for a central line: "ij placement . . . the line that helps us to give the pt insulin[], antibiotics and normal

---

[3] Garrett raises claims about his father's ability to consent to or refuse medical treatment, but it was Garrett himself who signed the consent form for the central line placement. Therefore, the ability of Clarence Garrett to

sa[line] and frequent blood drawing." *Id.* Garrett was aware of the procedure he consented to, and it is undisputed that Garrett signed and dated the form at block 10. On the second page of the consent form, it is again indicated the purpose of the placement of the central line at block 7, and at block 8, the form indicates that the "[t]reatment and/or procedure has been discussed with the patient and/or surrogate." The physician then signed the form as well. Without any other evidence, Garrett now denies that he was fully informed of the risks.

Garrett contends, further, that the central line was unnecessary because the medical records after April 11, 2015, indicate that his father did have vein access. However, Garrett cannot rely on his own layperson testimony to support this claim. Even the portions of the documents he highlighted indicate that a central line may be necessary if there are "too few sites" for intravenous lines, not that there is no venous access at all. [Doc. No. 87-2 (Garrett's Exhibit 71-3]. Neither Garrett nor the Court has the expertise to determine whether placement of a central line was necessary medical care. The fact that Garrett believes the procedure was unnecessary is insufficient to obtain a judicial finding that the physician's request for consent for this procedure was "false" or fraudulent.

Finally, Garrett contends that the placement of the central line caused his father to suffer a bacterial infection and cites to medical records from Drs. Jassal and Penn. However, those records indicate that there were multiple possible causes of Clarence Garrett's bacterial infection. [Doc. No. 87-3]. Without a medical expert, Garrett simply cannot show that his father's central line placement was medically unnecessary and/or that the procedure caused the harm suggested. Therefore, Garrett has failed to show as a matter of law that he is entitled to summary judgment

---

consent to treatment or refuse treatment addressed in Dr. Theresa Vail's expert report is not at issue.

on this claim, and, instead, the United States is entitled to summary judgment in its favor.

### (2)    Replacement of Central

Garrett next contends that OBVAMC should have obtained his informed consent to replacement of the central line when his father pulled it out. However, even assuming informed consent was required a second time, this claim suffers the same fate.   Again, without expert medical testimony, Garrett cannot show that this was medically unnecessary procedure and/or that it caused harm to Clarence Garrett.   Therefore, Garrett is not entitled to summary judgment on this claim, and the United States is entitled to summary judgment in its favor.

### (3)    Transfer to Watkins Logan

Garrett also contends that the United States is liable for failing to obtain his informed consent for the transfer of Clarence Garrett from OBVAMC to Watkins Logan.

Garrett points to his telephone records and to the testimony of OBVAMC employee, Jennifer Blair ("Blair"), to support his contention that he never gave informed consent for his father's transfer to Watkins Logan.   Blair was the OBVAMC employee who documented his telephonic consent to the transfer.   Garrett denies that he gave such consent.   He points out that Blair does not remember the telephone call, said that it usually takes about ten minutes to get consent, and then relies on his telephone records to show that no such call of that duration took place.

Leaving aside the fact that Blair's testimony was only a general estimate of how long it takes to obtain informed consent over the telephone, the records do show three calls to one of Garrett's telephone numbers.

Regardless, as with his other informed consent claims, even if Garrett's testimony that he

21

did not consent is found credible by this Court, he cannot prevail at trial. Not only must he prove the lack of informed consent, but he must produce a medical expert to show causal connection between the material risks of transfer and Clarence Garrett's loss of chance of survival and/or his ultimate death. Therefore, Garrett is not entitled to summary judgment on this claim, and, instead, the United States is entitled to summary judgment.

### b. Other Medical Malpractice Claims

As a related matter, Garrett alleges that OBVAMC committed medical malpractice through its employees in its care and treatment of his father, its refusal to transfer him to a LTAC, and its later decision to transfer him to Watkins Logan in an allegedly unstable condition.

To support his claims, Garrett relies on the expert medical opinion of Dr. Theresa Vail, a psychiatrist; his father's medical records; depositions; and the recordings he made of Dr. Mehmood, Michaels, and Graggs.

Dr. Vail does opine that, from her review of Clarence Garrett's medical records, "the medical staff at [OBVAMC] . . . was basing all their medical care on a psychiatric evaluation that did not meet the standard." [Doc. No. 81-4]. Thus, she provides evidence that the United States, through OBVAMC employees, breached the standard of care for conducting a psychiatric examination. Likewise, her opinion supports Garrett's contention that his father was incapable of providing consent for treatment and/or incapable of refusing treatment. However, again, Garrett fails to provide the additional expert medical evidence necessary to show that the allegedly breaching conduct caused either a loss of a chance of survival or caused Clarence Garrett's death. Dr. Vail simply does not opine on causation with regard to Clarence Garrett's treatment while at OBVAMC, Dr. Areno's failure to transfer Clarence Garrett to a LTAC in June

2015, or the decision to transfer him to Watkins Logan in July 2015.

Moreover, the Court has reviewed the transcripts provided by Garrett of his conversation with Dr. Mehmood on the first day he saw Clarence Garrett. That recording and transcript fails to supply the missing evidence. Dr. Mehmood does not state that there was a breach of the standard of care, or that such breach caused the harm about which Garrett complains, which is either the loss of chance of survival, or, ultimately, the death of his father.

Garrett also relies on his own opinion of the medical records, recordings of the two other OBVAMC employees who are not physicians, and the deposition of a physical therapy assistant to support his claims. However, his reliance is misplaced. Neither his own view, nor the views or opinions of non-physician employees are sufficient to supply causation. At best, the employees offered criticisms of OBVAMC, but could not provide the missing medical expert testimony on causation regarding Garrett's treatment while at OBVAMC. Phelps, the physical therapy assistant, contradicted information provided to Dr. Areno on Clarence Garrett's level of participation in physical therapy at the time that he denied transfer to a LTAC, but offered no evidence that he was lying about the information that he received from his fellow physicians and the physical therapist, that he otherwise acted fraudulently, or that his denial decision caused a lack of chance of survival or Clarence Garrett's ultimate demise. Finally, neither Garrett, the medical records themselves, nor any employee statements or depositions are sufficient to show that the decision to transfer Clarence Garrett to Watkins Logan caused a loss of chance of survival or his ultimate demise.

On the other hand, the United States has supplied both a rebuttal expert to Dr. Vail and its medical expert on causation. In rebuttal to Dr. Vail, the United States offers an expert opinion

from Dr. Christopher Ticknor, a psychiatrist, who opines that Clarence Garrett had the capacity to make medical decisions as of April 29, 2015.   Unlike Dr. Vail, however, Dr. Ticknor further opines on causation:   finding that "no amount of intervention would likely have changed the eventual terminal outcome for [Clarence] Garrett's metastatic cancer" and that "his capacity or non-capacity at a later point in time to engage in making medical decisions made no difference in the eventual outcome of his expected death."   [Doc. No. 81-6].

In addition to rebutting Dr. Vail's testimony, the United States relies on the expert report from Dr. J. Eric Stupka, a practicing intensivist, who frequently cares for very ill patients, including those suffering from sepsis and multi-organ failure, such as Clarence Garrett.   Dr. Stupka reviewed Clarence Garrett's medical records, Garrett's complaint, and he also reviewed Dr. Vail's expert report.   After review, Dr. Stupka opined that Clarence Garrett was a

> very chronically ill individual who was diagnosed with prostate cancer in 2008. Despite multiple chemotherapy regimens and radiation therapy to treat metastatic disease in his spine, his cancer continued to progress.   At the time of his admission [to OBVAMC] in 2015 his oncologists were planning on palliative chemotherapy for his terminal condition.   According to available records he also suffered from diabetes, hypertension, dyslipidemia, and congestive heart failure. In the setting of his severe chronic illness, he was admitted to [OBVAMC] in April of 2015.   At the time of his transfer from another facility he was critically ill with multi-system organ failure related to severe sepsis.

> Despite three months of aggressive and comprehensive inpatient medical care, his condition remained very poor.   In fact, during his stay at OBVAMC he was seen by fifteen different medical specialist teams.   This extensive medical care included treatment by internal medicine, infectious disease, neurosurgery, neurology, hematology/oncology, urology, pulmonary, interventional radiology, orthopedics, gastroenterology, general surgery, nutrition, physical/occupational therapy, psychiatry, and palliative care experts.   The care provided by these specialists was diligently performed, exhaustive in scope, and well within applicable standards of care.

> Though [Clarence] Garrett was often difficult to treat due to refusal of medial

therapy, his physicians expertly navigated this difficult situation. This included an extremely detailed psychiatric assessment of the patient, which revealed that Mr. Garrett had decision making capacity to refuse treatment. However, given his extremely poor medical prognosis, the results of the psychiatric assessment would not have influenced the end result. Even if it would have been determined that Mr[.] Garrett did not have the ability to make medical decisions, his clinical outcome would have been the same. Despite the heroic efforts undertaken during his hospitalization, the patient later passed away *from his multiple end-stage disease processes*. Nothing the [OBVAMC] did, or failed to do, resulted in the eventual death of Clarence Garrett after his discharge . . .

[Doc. No. 81-5 (emphasis added)].

This is not a simple case of obvious medical negligence. Clarence Garrett was by all accounts a very sick man, and Garrett cannot supply the missing causation evidence by relying on his own view or opinions of the medical records or on vague statements or even criticisms by secretly recorded OBVAMC employees.

The Court cannot substitute its judgment for that of a medical expert, and Garrett has not produced any medical expert to provide causation testimony or to challenge the medical opinion of the United States' expert on causation. Accordingly, Garrett's Motion for Summary Judgment is DENIED, and the United States' Motion for Summary Judgment is GRANTED.

## III.    CONCLUSION

For the foregoing reasons, the United States' Motion to Strike [Doc. No. 81] is GRANTED IN PART and DENIED IN PART, Garrett's Motion for Summary Judgment [Doc. No. 77] is DENIED, and the United States' Motion for Summary Judgment [Doc. No. 86] is GRANTED. Garrett's claims are DISMISSED WITH PREJUDICE.

MONROE, LOUISIANA, this 19th day of February, 2019.

_____
TERRY A. DOUGHTY
UNITED STATES DISTRIC JUDGE